UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 1:21-cv-11917

KARI MACRAE

            Plaintiff,

v.

MATTHEW MATTOS,
MATTHEW A. FERRON, and
HANOVER PUBLIC SCHOOLS,

            Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, the Defendants, Hanover Public Schools, Matthew Ferron and Matthew Mattos, submit this memorandum of law in support of their motion for summary judgment. *See* Fed.R.Civ.P 56.

## I.      BACKGROUND[1]

The Plaintiff in this matter, Kari MacRae, ("Plaintiff") is a resident of Bourne, Massachusetts. The Plaintiff began working as a teacher in 2015 and up until the time that she accepted employment with Hanover, worked in four different teaching positions over an approximately five-year span. SOF at ¶1.

---

[1] The facts in this section are drawn from the Statement of Material Undisputed Facts ("SOF"). As required under summary judgment procedure, such facts must be interpreted in favor of the non-moving party. In so stating undisputed material facts, the defendant does not concede or rely on these facts for any purpose other than this motion for summary judgment.

The Defendant, Matthew Ferron ("Ferron"), is the Superintendent of the Hanover Public School District (the "District") a position he has held for over 10 years. Ferron served as a Superintendent in another District for six years before taking the job in Hanover. SOF at ¶2. The Defendant, Matthew Mattos ("Mattos"), is the Principal of the District's High School, a position he has held since approximately August, 2021. Mattos was previously a Principal in another District for 16 years before taking the job in Hanover. SOF at ¶3.

In late August, 2021, the Plaintiff interviewed with the District's Curriculum Director, Matthew Plummer ("Plummer") for a position teaching high school level math and business courses. At the time of Plummer's interview with the Plaintiff, he did not know that she was, as of May, 2021, an elected member of the Bourne School Committee. SOF at ¶4. Plaintiff ran for the Bourne School Committee not because she wanted certain policies to be enacted in the District, but because of policies she, "…wanted to make sure weren't happening in our district." For example, she wanted to make sure children in Bourne were not taught critical race theory, which includes certain aspects, according to the Plaintiff, that fall within critical race theory's philosophies with different titles including DEI. SOF at ¶5.

By confirmatory letter dated August 25, 2021, the District hired the Plaintiff for the position, to begin on September 1, 2021. SOF at ¶6. On the same day the letter went out, the Bourne School Committee, Superintendent and Assistant Superintendent received a complaint from a "concerned citizen" regarding certain social media posts that had been made by the Plaintiff. SOF at ¶7. On the evening of September 1, 2021 (the same day Plaintiff began her employment in Hanover), the Bourne School Committee held an executive session to discuss the Plaintiff's social media posts. During its executive session, the Committee determined that some of the Plaintiff's posts violated the core values of the Bourne Public Schools. SOF at ¶8. As also

stated by the Chair during the open session, the Committee planned to have a public resolution at its next meeting to further address the matter. The Plaintiff believes that her posts did not violate any Bourne School Committee Policy because she made the posts before she became a member of the Committee. SOF at ¶9.

The Plaintiff did not inform the Hanover Public School District about the posts or Bourne School Committee's resolution against her as a result of the September 1, 2021 meeting. SOF at ¶10. Rather, over the first few days of her employment in Hanover, the Plaintiff inquired about becoming a class adviser, filling a student council position and taking a leadership role in the District's National Honor Society. SOF at ¶11.

On September 15, 2021, the Bourne School Committee and Chairperson learned that the Plaintiff's social media posts, including those aimed at the LGBTQ+ population had circulated, and, as a result, "….staff and students were very upset". At her deposition, the Plaintiff agreed that her posts had made staff and students upset. The Bourne Educators Association subsequently voted 100% in favor of making a public statement against the posts made by the Plaintiff.  SOF at ¶12.

On Friday, September 17, 2021, the Cape Cod Times published an article about the controversy regarding the Plaintiff's posts and her position on the Bourne School Committee. SOF at ¶13. The social media posts in question involved six "memes" and a video that the Plaintiff posted to her TikTok account. The Plaintiff added hashtags to the TikTok memes in question in order to increase their visibility on social media. The Plaintiff also included certain hashtags, like "racist", understanding that others who used the same term would then be more likely to find her posts when conducting a search using that term. SOF at ¶14.

The Plaintiff created the TikTok account in question around 2019 and used it for personal use. The public username of her TikTok account started as "Ms. MacRae" but, at some point, she changed it to "NanaMacof4" then "NanaMacof5". At the time of the posts in question, her public username on the account was "NanaMacof4" – the same name that appears on the memes themselves. SOF at ¶15. The Plaintiff used her TikTok account to interact with others, including her students. SOF at ¶16. At her deposition, the Plaintiff stated that TikTok deleted her "NanaMacof4" account for "community standards violations" because of the posts that are at issue in this case. The Plaintiff further testified that she continues to stand by the views expressed on her TikTok page and in her posts, "[o]ne hundred percent". SOF at ¶17.

Over the ensuing weekend following its Friday publication, Hanover's Superintendent, Matthew Ferron, was made aware of the September 17, 2021 Cape Cod Times article. Early in the morning of Monday, September 20, 2021, Plummer also sent Ferron a link to the article and expressed his own concern. SOF at ¶18. That same morning, Mattos met with the Plaintiff and notified her that the social media posts had come to the District's attention. As a result, Mattos told the Plaintiff that she was being placed on paid administrative leave pending an investigation into her social media posts. SOF at ¶19.

During the investigation, the District looked into the nature of the social media posts, media articles about them and followed how the Bourne School Committee and community were reacting to it, including during a meeting held by the School Committee on September 22, 2021. Through its investigation, the District became aware of the controversial posts in question – six different "memes" posted to the Plaintiff's TikTok account. SOF at ¶20. Although Mattos recalled at his deposition that he became aware of the actual social media posts from Plummer, he could not recall what he initially saw – the posts themselves or the Cape Cod Times news

article about them. However, once they found out about the six memes Plaintiff had posted to her TikTok account, Mattos, Ferron and Plummer were concerned that the nature of the posts could be offensive or hurtful to staff and students at HHS, including students in the Plaintiff's class. SOF at ¶21.

On September 22, 2021, the Bourne School Committee held at a meeting at which the Chair presented a timeline of events regarding the Plaintiff's social media posts, including numerous emails it had received from concerned citizens. SOF at ¶22. During the time available for public comment, over ten individuals spoke out with various concerns regarding the Plaintiff's posts. Many of these comments expressed a similar sentiment, that the posts did not create a safe, inclusive or welcoming learning environment within the school community. For example, one of the individuals who spoke out against the Plaintiff was an "out and proud" transgender student who emphasized how "harmful" Plaintiff's posts were both to himself and any transgender student. Others quoted statistical data from the CDC and other sources regarding the high suicide rate amongst LGBTQ+ students, emphasizing the vulnerability of such a population. SOF at ¶23. During the meeting, the Plaintiff offered an apology. She did not apologize for the content of the posts, but, instead, only for the attention it brought to the school and community. This is the same kind of apology the Plaintiff made when she spoke to the Cape Cod times: she was not sorry for her posts, only "for anyone feeling offended". SOF at ¶24. In addition to the concern expressed through public comment, the Plaintiff acknowledged during her deposition that she had received numerous emails on her Bourne School Committee email account from people, including students, expressing concerns about not feeling safe in the District because of her posts. SOF at ¶25.

In the days following the Bourne School Committee meeting, the Plaintiff reached out to the Vice President of the Hanover Teacher's Union, Andrew McLean, and corresponded with him regarding issues about her leave and the investigation process. During the same time frame, McLean heard students comment about the social media posts. Some teachers also expressed concern to McLean that the Plaintiff's posts would be a distraction to teaching and learning. SOF at ¶26. At his deposition, Plaintiff's counsel asked McLean to quantify how these posts would be a disruption to teaching and learning. McLean explained, "In terms of me moving it on, I moved it on immediately. In terms of what the mental headspace of my students are, I cannot say because it's not possible for me to get inside their brain and tell you what they're thinking about, but it was certainly occupying enough of their time to be mentioning it. So I would imagine that you're really going to measure that disruption in terms of days and weeks of what it detracted to from our overall school culture and what a distraction it was from the process of teaching and learning." McLean further noted that the students in question were not those that were directly impacted by social media posts but yet it was stretching to them nonetheless, "…so it was absolutely having an effect on the entire community.". SOF at ¶27.

On September 24, 2021, Mattos held a meeting to interview the Plaintiff as part of his investigation. In addition to Mattos and the Plaintiff, Ann Galotti, the Math Department Head attended the meeting as did McLean, as the Plaintiff's union representative. SOF at ¶28. Prior to the meeting, the Plaintiff and McLean met for about 15 minutes to discuss the process and substance of the meeting. SOF at ¶29. To open the meeting, Mattos provided the Plaintiff with a copy of the TikTok posts, a document identifying the District's core values and its mission statement. Mattos then proceeded to ask the Plaintiff a series of questions that he had written out

prior to the interview. After each question, Mattos took down the Plaintiff's answer as best he could, word for word, and read back what he wrote to make sure Plaintiff agreed. SOF at ¶30.

Among other questions, Mattos asked the Plaintiff if the situation in Bourne may impact the learning environment and students in her class. The Plaintiff acknowledged it would. SOF at ¶31. Mattos also asked the Plaintiff if she understood how the media coverage would be widespread amongst students and families of Hanover High School. The Plaintiff also said yes. SOF at ¶32. In another question, Mattos asked the Plaintiff if she could understand how her posts and what had been reported in the media would affect the learning process within the District and its core values and mission statement. The Plaintiff acknowledged how it could be concerning to the District.  SOF at ¶33.

At his deposition, Mattos was asked why he believed that some of the memes posted by the Plaintiff were disparaging towards transgender individuals. Mattos stated: "In a sense, it's belittling what they believe in. What happens in the state of education, particularly at the high school level it that there are a lot of students that are at conflict with themselves. This building is supposed to be an accepting community where kids can come in here and learn. If a student is uncomfortable, you know, with a teacher in front of them, then they're not going to be as apt to learn at the capacity that we want them to." Mattos was aware the Plaintiff had transgender children in her classroom. SOF at ¶34. At her deposition, the Plaintiff agreed that some of the memes were derogatory towards transgender people. SOF at ¶35.

For his part, McLean thought the Plaintiff's posts, given their dismissiveness towards students struggling with gender identity, "…would be a huge distraction from teaching and learning for those students." As McLean put it, they "…hit the trifecta of transphobic, homophobic and racist". This is similar to Plummer's reaction when he first saw the memes, "I

just kind of, in my mind, looked at them as one thing, one ball of hate. You know, there's transphobia there, there's racism, there's homophobia there." <u>SOF</u> at ¶36.

Regarding the transgender memes, McLean testified at his deposition: "Again, that is really the point, is that nobody is teaching that. Its completely dismissive of the experience that a transgender person might be experiencing. It is implying by definition that it is a choice, in some way whimsical, what is actually a deep-rooted, most likely genetic piece of that person's makeup and identity. And to dismiss it as a choice of simply being I want to be a boy or girl is – it completely lacks empathy to a vulnerable subgroup of our school population, which is why it would have been such an incredible distraction from teaching and learning." <u>SOF</u> at ¶37.

At her deposition, the Plaintiff acknowledged that she was aware students and staff knew of the media coverage regarding her social media posts. <u>SOF</u> at ¶38. The Plaintiff testified that she had both African American and LGBTQ+ students in her classes. She was unsure if she had any transgender students. <u>SOF</u> at ¶39. The Plaintiff testified in her deposition that her posts would place students and staff in a position where they do not feel safe, welcomed or appreciated. She agreed that her posts did not show tolerance or acceptance of transgender individuals. <u>SOF</u> at ¶40. In the District's Mission Statement, provided to the Plaintiff at her interview with Mattos, the first bullet under "District Beliefs" is, "Ensure a safe learning environment based on respectful relationships." In the same document, under "Core Values", the District lists "Collaborative relationships" and "Respect for human differences". <u>SOF</u> at ¶41. When asked about one of the memes the Plaintiff posted that is derogatory towards immigrants, the Plaintiff acknowledged she holds animus towards illegal immigrants. <u>SOF</u> at ¶42

As Plummer stated, in response to his reaction to seeing the memes in question, "If a student could possibly think the teacher hates them, how could they want to be in that room?

How could they feel safe in that room?" In particular, Plummer thought of two students in the Plaintiff's caseload and that "…they would be crushed if they knew their teacher felt this way about them." <u>SOF</u> at ¶43. The Plaintiff concluded the interview by saying, "I am very sorry that this has impacted the school community." <u>SOF</u> at ¶44.

Teachers in Hanover Public Schools have testified that the Plaintiff's social media posts did in fact cause a disruption in learning within the District. <u>SOF</u> at ¶45. Mattos believed the posts would have a negative impact on teaching and learning, especially based on the Plaintiff's responses to his questions during the interview. <u>SOF</u> at ¶46. Following the interview, Mattos had his hand-written notes typed up into a transcript. <u>SOF</u> at ¶47.

On September 29, 2021, the District issued a letter to the Plaintiff terminating her employment. Ferron and Mattos, with input from Plummer, made the decision to terminate the Plaintiff because of her social media posts and interview admissions that they would have an adverse impact on teaching and student learning. Mattos also took into consideration what he believed student reactions would be. For example, Mattos knew that there were LGTBQ+ students in the Plaintiff's classroom and that the posts would be upsetting to them, thereby having the direct effect of disrupting learning. <u>SOF</u> at ¶48. Ferron was also concerned about the memes posted by the Plaintiff. Particularly that the Plaintiff disparaged multiple groups, including the transgender community. The Superintendent was also concerned that the memes were available for anyone to see, including staff and students. This, in turn, would have the effect of students not feeling safe in the Plaintiff's classroom. <u>SOF</u> at ¶49. The posts were also a subject of concern amongst District faculty, members of which had approached Ferron and spoke with him about them. <u>SOF</u> at ¶50.

Following Mattos's interview of the Plaintiff, the Superintendent spoke with Mattos and took into consideration the Plaintiff's acknowledgment that her posts could be of concern to students, that people had seen them and that it was being discussed in the school community. The Superintendent believed the Plaintiff should be fired, in part because, "the memes themselves were objectively, in my opinion, objectively disparaging to groups of people that are in our community, especially young people who, if they saw them or read them or brought to their attention, those students I believe would not feel safe or supported attending a class with a teacher who was, you know, who those positions and feelings were posted publically and attributed to her without – which she had acknowledged." In addition to the memes being hurtful to students, Ferron was concerned that the Plaintiff's employment would be a continued distraction as her posts had caused concern and conversation among staff and students. SOF at ¶51.

Both the Plaintiff and McLean testified that the process conducted by Mattos leading to the Plaintiff's termination was fair and thorough. SOF at ¶52. The Plaintiff subsequently contacted McLean saying she wanted to fight for her job. McLean told her he did not see any realistic avenue of appeal. SOF at ¶53.

Even following her termination, the Plaintiff's social media posts have continued to cause a distraction to classrooms within Hanover Public Schools. To McLean, it wasn't also just a case of LGBTQ+ students feeling uncomfortable, if the Plaintiff remained employed with the District there was the possibility that other students might egg her on and ask her to tell them more about her controversial social media posts. SOF at ¶54. Following her termination, certain individuals reached out to the Plaintiff about running for State Senate and in November or December, 2021 she announced her candidacy. Her campaign website touted in large letters that her campaign

was built on "transparency and accountability". <u>SOF</u> at ¶55. The Plaintiff lost the election. <u>SOF</u> at ¶56.

II.    **<u>LEGAL ARGUMENT</u>**

    A.    **The Defendants Are Entitled to Summary Judgment in Their Favor on Plaintiff's First Amendment Retaliation Claim.**

        1.    **Standard of Review**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(e); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law'." <u>Iverson v. City of Boston</u>, 452 F.3d 94, 98 (1st Cir. 2006). While the court must view the evidence in the light most favorable to the nonmoving party, the nonmoving party may not rely merely upon "conclusory allegations, improbable inferences, and unsupported speculation" to defeat summary judgment. <u>Forestier Fradera v. Municipality of Mayaguez</u>, 440 F.3d 17, 21 (1st Cir. 2006)*; see* <u>Estate of Bennett v. Wainwright</u>, 548 F.3d 155, 165 (1st Cir. 2008) (court is "not required to contemplate conclusory allegations, improbable inferences, or unsupported speculation."). Also, the court does not "weigh the credibility of the testimony," but presumes "that a rational fact finder would accept it as stated by the witness."  <u>Gonzalez v. El Dia, Inc.</u>, 304 F.3d 63, 68 (1st Cir. 2002).

    B.    **Summary Judgment Should Enter for the Defendants on the Plaintiff's First Amendment Retaliation Claim Under the <u>Pickering</u> Balancing Test.**

The sole count contained in Plaintiff's Amended Complaint alleges First Amendment

retaliation under 42 U.S.C. § 1983. The Defendants seek summary judgment on the grounds that (1) there was no constitutional violation (2) they were nonetheless adequately justified in discharging the Plaintiff and (3) they are entitled to qualified immunity.

A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law and, second, the conduct must have worked a denial of rights secured by the Constitution or be federal law. Soto v. Flores, 103 F. 3d 1056, 1061 (1st Cir. 1997).

"It is well settled that 'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out.'" Decotiis v. Whittemore, 635 F. 3d 22, 29 (1st Cir. 2011). In the public employment context, however, this right is not unlimited as explained by the Supreme Court in Garcetti v. Ceballos, 54 U.S. 410, 418 (2006), "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." This is because:

> [g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

> Garcetti, 547 U.S. at 418-19.

Consequently, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." Davignon v. Hodgson, 524 F. 3d. 91, 100 (1st Cir. 2008) (quoting City of San Diego v. Roe, 543 U.S. 77, 80 (2004).

In Garcetti, the Supreme Court articulated a two-pronged approach to interpret those constitutional protections that are accorded to public employee speech:

"The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."

Garcetti v. Ceballos, 547 U.S. 410, 418 (2006), (citations omitted).

The First Circuit has crafted its own similar three-part inquiry necessary to determine whether an adverse employment action against a public employee violates First Amendment free speech rights:

First, a court must determine "whether the employee spoke as a citizen on a matter of public concern. Second, the court must 'balance…the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employer. Third, the employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision. If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show it would that it would have reached the same decision even absent the protected conduct.

Decotiis v. Whittemore, 635 F.3d 22, 29-30 (2011).

The Defendants do not contest, at least at the time the Plaintiff made her TikTok posts in approximately March 2021, that she did so as a private citizen or that her posts were a motivating factor in the decision to terminate the Plaintiff. The Defendants vehemently are of the position, however, that an application of the Pickering balancing test weighs heavily in their favor and that the District was entirely justified in terminating the Plaintiff based on the

disruption to teaching and learning the Plaintiff's posts caused and would have continued to cause if she stayed in her position.

As stated supra, "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." Garcetti, 547 U.S.  at 418. Where an employer has terminated a public employee for engaging in speech, the Court must also, "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391 U.S. 563, 568 (1968); Connick v. Meyers, 461 U.S. 138, 140 (1983).[2] Further, "[i]n performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Rankin v. McPherson, 483 U.S. 378, 388 (1987). In short, the Court must decide if the employer had "an adequate justification" for the termination. Garcetti, 547 U.S. at 418.

The Plaintiff's six TikTok memes at issue in this case are unquestionably offensive. As observed by every Hanover employee who testified in the case, they alternately contain themes of homophobia, transphobia and racism. Another of the posts openly derides immigrants. In sum, taken together they are, what Plummer observed, "a ball of hate".

This reaction to Plaintiff's memes went well beyond Hanover. In Bourne, the School Committee voted that the memes violated the District's core values. The Bourne teacher's union voted in complete uniformity – 100% - to denounce the Plaintiff's memes. Bourne parents, community members and even students all articulately voiced the many ways in which Plaintiff's posts had a negative impact on teaching, learning, safety and the already vulnerable populations

---

[2] It is the State that bears the burden of justifying the discharge on legitimate grounds. Connick, 461 U.S. at 150.

to which the memes were dismissive of, derogatory towards and mocked. For her part, even the Plaintiff conceded at her deposition that some of her memes were derogatory towards transgender individuals. More, in response to questioning about one post that disparaged immigrants, the Plaintiff acknowledged she holds animus towards illegal immigrants.

In an application of the Pickering balancing test, the context and nature of the Plaintiff's posts demonstrate that the Defendants were more than justified in terminating the Plaintiff's employment. Not only were the posts in question offensive to numerous protected groups to which anti-discrimination laws apply, they were repugnant to the core values of Hanover Public School District. As its mission statement states, the District works to "ensure a safe learning environment based on respectful relationships" and teaches "respect for human differences". Yet, by her own admission, the Plaintiff understood that her memes show intolerance to others, like transgender individuals. More, the Plaintiff continues to stand by her posts, "100 percent". She is not sorry for her posts, as she told the Cape Cod Times and Bourne community; only for how others feel because of them.

In sum, the Plaintiff's intolerant views expressed through her TikTok posts created an unsafe learning environment that was completely antithetical towards the welcoming culture she was supposed to nurture as a teacher in the Hanover School District. The Court must give, "full consideration to the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Pickering, at 150. Continuing to employ the Plaintiff in light of her posts would have been an ongoing, enormous distraction to teaching and learning, as well as the relationships within the District and community. To be sure, the District did not have to wait for "events to unfold to the extent that the disruption of the office and the destruction of the

working relationships is manifest before taking action." Id. at 152, See also Flynn v. Forrest, 605 F. Supp. 3d 319, 330 (D. Mass. 2022).

Although the District would have been well within its right to have terminated the Plaintiff's employment based on potential disruption alone,[3] the factual record nonetheless abundantly demonstrates that her posts had created a significant disruption to teaching and learning in the time between when the District became aware of the posts and the decision to terminate was made. The posts became a topic of discussion amongst staff, leading to teachers approaching members of the administration with concern. Paramount to all of this, however, is that the Plaintiff's posts were wholly detrimental to student learning – the very purpose of the Hanover Public School District and Plaintiff's job. Again, the Plaintiff's own testimony crystallizes the point: in her interview with Mattos, she acknowledged that her posts may impact the learning environment and students in her class. She further conceded that her posts would affect the learning process within the District, its core values, mission statement and that she understood why this would be concerning.

While the Plaintiff's concessions are notable, they are also an understatement. Indeed, certain students in her class were individuals in the LGBTQ+, African American or transgender community – children who embodied the very traits the Plaintiff's posts mocked. It is also entirely possible that the Plaintiff could have had or would have an immigrant, illegal or not, in her class – an individual who, by her own admission, the Plaintiff would have animus towards. By continuing to be employed, the Plaintiff was seeking to place herself in a position of authority over students she unapologetically had derided. To paraphrase an observation made by the

---

[3] See Waters v. Churchill, 511 U.S. 661, 671 (holding that "potential disruptiveness" was sufficient for employer action in response to nurse's speech critical of her supervisor and department)

Curriculum Director, Plummer, when he saw the posts: how could a student learn in that kind of environment if they believed their teacher hated them?

That the Plaintiff's posts were made months prior to her employment or on a personal TikTok account is, in the Pickering context, a complete red herring. The Plaintiff's use of a pseudonym in making the posts did not prevent them from being discovered in the first place. In any event, Plaintiff testified that she had used the account to interact with students, belying any assertion it was actually private or that her use of a pseudonym mattered. As the 4th Circuit has recognized, "[a] social media platform amplifies the distribution of the speaker's message – which favors the employee's free speech interests – but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency." Liverman v. City of Petersburg, 844 F. 3d 400, 409 (4th Cir. 2016). Carey v. Throwe, 957 F. 3d 468 (4th Cir. 2020). It was exactly this same kind of potential for exponential disruption –already significant prior to Plaintiff's termination – that Ferron and Mattos were concerned would happen if the Plaintiff continued to be employed.

The timing of Plaintiff's posts is equally weightless in light of the surrounding context. To the extent Plaintiff uses this as a means to disavow her speech because it was made prior to her employment with Hanover, she has testified that she still stands by it and offers no apologies. Thus, it is as meaningful (i.e. contradictory) to her duties a teacher and responsibilities as a Hanover employee regardless of the timing of her posts and is otherwise vastly overshadowed by the manner in which the posts had become public knowledge, the source of numerous media reports and was at odds with the core values of her employer.. "Where, as here, a… teacher elects a mode of communication—audible denigration and visible petulance in the learning environment, in front of students and others—that plainly conflicts with the school's legitimate

interest in requiring full participation in the designated curriculum, the constitutional balance tips sharply in the employer's favor." Hennessy v. City of Melrose, 194 F. 3d. 237, 248 (1st Cir. 1999). Plaintiff's audible denigration and visible petulance is not just in front of her students. It is far worse. It is about her students. It fundamentally is at conflict with creating a safe learning environment where all who come before her as a teacher would feel welcomed. Continuing to employ the Plaintiff in light of her posts would have placed some students in the impossible position of having to be taught by an individual who fundamentally disagreed with the core values of the District and their own identity. Under these circumstances, the Defendants urge the Court to find that the Pickering balancing test weighs in their favor and termination of the Plaintiff's employment was justified in order to maintain a harmonious, safe and welcoming learning environment amongst staff and students.

### 3. The Defendants Matthew Ferron and Matthew Mattos are Entitled to Qualified Immunity on Plaintiff's First Amendment Claim.

The First Circuit applies a two-prong analysis in determining whether a defendant is entitled to qualified immunity: "(1) whether the facts alleged ... by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right at issue was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). It should be noted that it is irrelevant if a public official is sued in their official or personal capacity[4] as they are not "persons" subject to personal liability under 42 U.S.C. s. 1983. O'Malley v. Sheriff of Worcester County, 415 Mass. 132, 142 (1993).

---

[4] The Plaintiff's Amended Complainant alleges that Defendants Matthew Mattos and Matthew Ferron are sued in their personal capacity. Para. 6. The Plaintiff's Amended Complaint does not otherwise allege that these Defendants are sued in an individual capacity.

As discussed above, the undisputed facts demonstrate that Defendants did not violate the Plaintiff's First Amendment right. Moreover, the Plaintiff cannot identify a case in which substantially similar conduct has been determined to violate any constitutional right, which would have given the Defendants the requisite notice that their actions were unlawful. As such, the Defendants are entitled to qualified immunity.

The "clearly established" step comprises two subparts: first, whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right," and second, "whether in the specific context of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" Mosher v. Nelson, 589 F. 3d 488, 493 (1st Cir. 2009). The second step in the inquiry, "while requiring a legal determination, is highly fact specific." Estrada v. Rhode Island, 594 F. 3d 56, 63 (1st. Cir. 2010) (quoting Nelson v. Kline, 242 F. 3d 33, 35 n. 2 (1st Cir. 2001) Notably, after the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223, 236 (2009), the two parts of the qualified immunity analysis may be considered in either order.

Here, the Defendants are entitled to qualified immunity because the Plaintiff cannot demonstrate they were on clear notice that the Plaintiff's speech was constitutional when the decision was made to terminate the Plaintiff. See Costa-Urena v. Segarra, 590 F. 3d 18, 29 (1st Cir. 2009). Cases considering a Garcetti analysis cited infra make it clear that the landscape in this area of the law is constantly evolving and without clear contours. Based on the state of the law at the time of her termination the Plaintiff cannot demonstrate that the Defendants knew they were violating a clearly established constitutional right held by the Plaintiff at that time. For these reasons, the Defendants are entitled to qualified immunity.

## CONCLUSION

For the reasons above, the Defendants, Hanover Public Schools, Matthew Ferron and Matthew Mattos, move this Honorable Court to allow their Motion for Summary Judgment, as there are no disputed material facts and they are entitled to judgment as a matter of law on the lone count of First Amendment retaliation contained in Plaintiff's Amended Complaint.

Respectfully submitted,

Defendants,
By their attorneys,

*/s/ Gregor A. Pagnini*
Leonard H. Kesten, BBO #542042
Gregor A. Pagnini, BBO #667659
BRODY, HARDOON, PERKINS & KESTEN, LLP
699 Boylston Street
Boston, MA 02116
(617) 880-7100
lkesten@bhpklaw.com
gpagnini@bhpklaw.com

Dated:  February 17, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent to those participants indicated as non-registered participants.

*/s/ Gregor A. Pagnini*
Gregor A. Pagnini, BBO #667659

DATED: February 17, 2023