## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **KARI MACRAE,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | )   **Civil Action No. 21-cv-11917-DJC** |
| **MATTHEW MATTOS,** | ) |
| **MATTHEW A. FERRON, and** | ) |
| **HANOVER PUBLIC SCHOOLS,** | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                          **September 25, 2023**

### I.    Introduction

Plaintiff Kari MacRae ("MacRae") filed this lawsuit against Defendants Matthew Mattos ("Mattos"), Matthew A. Ferron ("Ferron") and the Hanover Public Schools (the "District," collectively "Defendants") under 42 U.S.C. § 1983, alleging that Defendants retaliated against her for exercising her First Amendment rights.  D. 20.  Defendants have moved for summary judgment, D. 27, and also to strike MacRae's affidavit in support of her opposition ("MacRae Affidavit"), D. 40.  For the reasons stated below, the Court ALLOWS in part and DENIES in part the motion to strike, D. 40, and ALLOWS the motion for summary judgment, D. 27.

### II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the

1

outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 322–23 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. See Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### III.   Factual Background

The Court draws the following facts from the parties' statements of undisputed facts and accompanying exhibits, D. 29, D. 36, D. 37, which are undisputed unless otherwise noted.

#### A.   MacRae's Social Media Posts

MacRae is a Bourne resident who began working as a schoolteacher in 2015. D. 36 ¶ 1. Prior to her employment in the District, MacRae held several teaching positions and operated a TikTok account under the username "NanaMacof4." Id. ¶¶ 1, 15; D. 29-3 at 14. Using that TikTok account, MacRae liked, shared, posted or reposted six memes that are at issue in the present litigation. See D. 36 ¶¶ 14–15; D. 29-3 at 17; D. 29-9. The District characterized the memes, D. 29-9, as "contain[ing] themes of homophobia, transphobia and racism," D. 28 at 14, and MacRae agreed that some could be viewed as derogatory towards transgender people, D. 36 ¶ 35; D. 29-3 at 9, 30-31.

MacRae was also preparing to run for the Bourne School Committee which was scheduled to hold an election on May 17, 2021. D. 29-3 at 11; D. 39 ¶¶ 1–3; see D. 29-8. In addition to the

six memes, on May 17, 2021, MacRae posted a video to her TikTok account regarding her position as a school board candidate.  D. 29-8; D. 37 ¶ 9; see D. 36 ¶ 15.  In that video, MacRae expressed her view that critical race theory should not be taught in public schools and that students should not be "taught that they can choose whether or not they want to be a girl or a boy."  D. 29-8; see D. 36 ¶ 5.  MacRae was elected to the Bourne School Board.  D. 29-3 at 11; D. 37 ¶ 4.

In August 2021, MacRae was interviewed by the District's Curriculum Director Matthew Plummer ("Plummer").  D. 36 ¶ 4.  On August 25, 2021, the District hired MacRae to teach math and business classes starting on September 1, 2021.  Id. ¶ 6; D. 29-5.  The classes MacRae taught included both African American and LGBTQ+ students.  D. 36 ¶ 39.  On the same day that the District in Hanover hired MacRae, the Bourne School Committee received a complaint from a community member regarding MacRae's social media posts and its executive session "determined that some of the postings violated the core values of the Bourne Public Schools."  D. 29-6 at 1; D. 29-7 at 2; see D. 36 ¶¶ 7–8.  The Bourne School Committee resolved to address MacRae's social media posts at the next meeting and hear a "more formal statement" from MacRae.  D. 29-7 at 2; see D. 36 ¶ 9.  In response, the Bourne Educators Association voted unanimously to "make a public statement against the comments made by Ms. MacRae."  D. 29-6 at 2; D. 36 ¶ 12 (disputing impact of Bourne School Committee's findings on Defendants and whether some community members supported MacRae, but not vote of Bourne Educators Association).  On Friday, September 17, 2021, the Cape Cod Times published an article regarding MacRae's activity on TikTok and her role on the Bourne School Committee.  D. 29-8.

### B.    Defendants' Investigation and MacRae's Termination

By the morning of Monday, September 20, 2021, Ferron, the District's superintendent, became aware of the Cape Cod Times article.  D. 36 ¶ 18.  Later that morning, the Hanover High School principal Mattos met with MacRae, notified her that the District was aware of her social

media posts and placed her on paid administrative leave while the District conducted an investigation.  Id. ¶ 19.  During the investigation, the District became aware of the six memes associated with MacRae's TikTok account.  Id. ¶ 20.  Within a day or so of MacRae being placed on leave, Andrew McLean ("McLean"), a science teacher and vice president of the teacher's union, observed students commenting on MacRae's social media posts, but he could not recall the exact nature of the students' conversation.  Id. ¶ 26.

Contemporaneously, on September 22, 2021, the Bourne School Committee held a public meeting wherein multiple individuals discussed their concerns regarding MacRae's social media activity, including public discussion that "the posts did not create a safe, inclusive or welcoming learning environment."  Id. ¶¶ 22-23.  Several speakers described the harmful impact of MacRae's social media activity on transgender and other LGBTQ children and referenced the elevated risk of suicide for transgender and African American youth.  D. 29-6 at 3–6.  Some speakers voiced support for MacRae.  D. 36 ¶ 23; D. 29-6 at 4–6.  Ferron observed part of the Bourne School Committee meeting and spoke about it with Mattos and Plummer the next day.  D. 29-1 at 10.  Ferron testified that he did not "remember anything coming out of that meeting that really affected [his] decisionmaking process when it came to ultimately coming down to what [the District was] going to do in Hanover."  Id.

On September 24, 2021, Mattos convened a meeting between himself, MacRae, Ann Galotti (the Math Department Head), and McLean, as MacRae's union representative.  D. 36 ¶ 28.  McLean met with MacRae for about fifteen minutes prior to the start of the meeting.  Id. ¶ 29.  Mattos had written out a series of questions interview questions.  Id. ¶ 30.  During the interview, he transcribed MacRae's responses to each question, as best as he could.  Id. ¶ 30; D. 29-13.  Mattos also provided MacRae with a copy of the District's mission statement which includes

4

"[e]nsur[ing] a safe learning environment based on respectful relationships."  D. 36 ¶ 41.[1]  The

mission statement also listed "Collaborative relationships" and "Respect for human differences"

as "Core Values."  Id.; D. 29-19.

Ferron and Mattos made the decision to terminate MacRae with input from Plummer.  D.

36 ¶ 48.  On September 29, 2021, the District issued a termination letter to Plaintiff, explaining

that "continuing your employment in light of your social media posts would have a significant

negative impact on student learning at HHS."  Id. (disputing reasonableness of basis for MacRae's

termination and substance of MacRae's admissions during interview, but not content of

termination letter); D. 29-17 at 2.

## IV.    Procedural History

MacRae initiated this action on November 29, 2021, D. 1, and filed an amended complaint

on June 23, 2022, asserting a claim for First Amendment retaliation.  D. 20.  Defendants now move

for summary judgment and also to strike the MacRae Affidavit.  D. 27; D. 40.  The Court heard

the parties on the pending motions and took these matters under advisement.  D. 42.

## V.    Discussion

### A.    <u>Motion to Strike</u>

Defendants request that this Court strike the MacRae Affidavit, D. 36-2 at 95–96 ("MacRae

Aff.") in its entirety because MacRae "seeks to materially alter prior deposition testimony and then

rely on the so-called newly realized assertions to state that disputes of fact now exist."  D. 40 at 1.

---

[1] MacRae disputes whether Mattos provided her with a copy of the District's mission statement
and cites her deposition testimony.  D. 36 ¶ 41 (citing D. 36-1 at 60).  The portion of MacRae's
deposition testimony cited, however, states that MacRae never received a "handout" containing
Mattos's "written questions."  D. 29-3 at 40; D. 36-1 at 60.  MacRae in fact testified that she
received a copy of the District's mission statement during the September 24 meeting.  D. 29-3 at
43.

"When an interested witness has given clear answers to unambiguous questions [at a deposition], he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 50 (1st Cir. 2019) (alteration in original) (quoting Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 30 (1st Cir. 2019)).

There are three potential conflicts between MacRae's affidavit and deposition testimony. First, MacRae avers that the "Bourne School Committee member election" was "scheduled for May 17, 2022." MacRae Aff. ¶ 3. In her deposition, MacRae testified that the election took place "in May of 2021." D. 29-3 at 11. Given MacRae's deposition testimony and evidence in the record showing that MacRae was a Bourne School Committee member well before May 2022, the Court will strike this portion of the affidavit. See D. 29-7 (listing MacRae as school committee member at September 1, 2021 meeting); D. 29-8 at 1 (reporting in September 2021 that MacRae ran for school committee in May).

Second, MacRae avers that she did not post one of the six memes, the "Track Meet Meme"[2] and that it "was posted by another TikTok user." MacRae Aff. ¶ 9. She further avers that the other TikTok user "tagged" her NanaMacof4 account, thus causing the meme to "appear if someone searched for NanaMacof4 on TikTok." Id. ¶ 10. During her deposition, MacRae testified with regard to all six memes that "[a] couple of them I shared or liked and some of them I reposted" and that she "liked them or shared them or reshared them." D. 29-3 at 17. To the extent that she now is attempting to disavow such testimony as to the Track Meme with any attestation in her affidavit, the Court rejects same. As the MacRae Affidavit, however, does not deny (as she had

---

[2] This meme contains an image of a muscular bearded man wearing a sports bra and shorts under the text, "Hi my name is Meagan. I'm here for the Girl's track meet." The image is captioned "Equality doesn't always mean equity." D. 29-9; D. 29-3 at 17.

previously testified), that she liked or shared or reposted the meme in some fashion, the Court need not strike any particular paragraph of the affidavit.  See Clapp v. Fanning, No. 18-CV-10426-ADB, 2022 WL 827404, at *2 (D. Mass. Mar. 18, 2022) (declining to "parse through each contested response" in ruling on motion to strike and simply ignoring speculative, conclusory and marginally relevant statements").

Third, Defendants assert that MacRae's averment that she "created and posted the TikTok video on Election Day as part of my campaign," MacRae Aff. ¶ 13, is "another new assertion not raised during her deposition." D. 40 at 2.  Defendants note that MacRae testified to posting the video on anonymously on a "private account" rather than a public account. D. 39 at 4; D. 29-3 at 36.  On the other hand, MacRae did not testify that the TikTok video was unrelated to the school board election and Defendants do not dispute the reported timing or content of the video.  See D. 29-8 (reporting that MacRae stated "the reason I ran for school board . . . is to ensure that students, at least in our town, are not being taught critical race theory" in TikTok video "on what appeared to be Election Day").  The Court will not strike paragraph 13 of the MacRae Affidavit, but considers in the context of the rest of the record of undisputed, material facts.

Accordingly, the Court allows the motion to strike with regard to the date of the Bourne School Committee election in paragraph three and otherwise denies the motion.

### B. **First Amendment Retaliation**

#### 1. *Pickering Balancing Test*

"[T]he First Amendment protects (among other things) the right to free speech." Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 141 (1st Cir. 2016).  The First Circuit has set forth a three-part inquiry which governs "whether an adverse employment action against a public employee violates her First Amendment free speech rights." Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011).  First, the Court "must determine whether the employee spoke as a citizen on a

matter of public concern" and, second, "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. (alterations in original) (internal quotation marks and citations omitted).  These first two elements are questions of law to be decided by the Court.  See Guilloty Perez v. Pierluisi, 339 F.3d 43, 51 (1st Cir. 2003). If they are established, the analysis turns to the third element, wherein "the employee must 'show that the protected expression was a substantial or motivating factor in the adverse employment decision.'"  Decotiis, 635 F.3d at 29 (citation omitted).

MacRae contends that the three-part framework should not apply where the government retaliates against an employee for pre-employment speech, as opposed to speech that occurs during employment.  D. 35 at 16.  MacRae urges the Court to instead adopt a "general standard" wherein "the plaintiff must first show that his conduct was constitutionally protected and, second, he must show proof of a causal connection between the allegedly protected conduct and the supposedly retaliatory response."  Id. at 17 (quoting Najas Realty, 821 F.3d at 141 (affirming dismissal of private company's First Amendment claim against town government)).  This proposed standard lacks any consideration of the government's interest.  Although MacRae faults Defendants for not citing to cases involving pre-employment speech, the only such case identified by MacRae does not support her position.  Id. at 16–17 (quoting Cleavenger v. Univ. of Oregon, No. CV 13-1908-DOC, 2015 WL 4663304, at *10–12 (D. Or. Aug. 6, 2015)).  In Cleavenger, the government argued that retaliation against pre-employment speech was impossible because an employer could not intend to chill speech which had already ended.  Cleavenger, 2015 WL 4663304, at *10.  The district court rejected the government's argument and ruled that an employee plausibly pled retaliation for pre-employment speech where the employer's actions would deter the speech of

"those who could apply for government employment . . . lest their words later justify firing without cause." Id. at *11 (alteration in original) (citation omitted). Cleavenger does not suggest that the test for public employees' First Amendment retaliation claims should be set aside for a different standard. See id. at *6 (setting forth standard for balancing public employees' interest in free speech against government interest); see also Riel v. City of Santa Monica, No. CV 14-04692-BRO (JEMX), 2014 WL 12694159, at *1–2, 6–7 (C.D. Cal. Sept. 22, 2014) (balancing plaintiff's interest in pre-employment speech critical of city government against city's interests as her employer). Accordingly, the Court concludes that the well-settled First Circuit three-part framework for evaluating public employees' First Amendment retaliation claims governs here.

For the purposes of the present motion, Defendants "do not contest, at least at the time the Plaintiff made her TikTok posts in approximately March 2021, that she did so as a private citizen or that her posts were a motivating factor in the decision to terminate the Plaintiff." D. 28 at 13. Instead Defendants argue that Plaintiffs' speech caused a "disruption to teaching and learning" which justified her termination under the second factor. Id. at 13–14.

The second factor, often referred to as the Pickering balancing test, asks "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 135 (1st Cir. 2022) (quoting Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007)); Decotiis, 635 F.3d at 35. The Court "attempts to balance the value of an employee's speech—both the employee's own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." Decotiis, 635 F.3d at 35 (internal quotation marks and citation omitted). "[T]he stronger the First Amendment interests in

9

the [employee's] speech, the stronger the justification the employer must have." Curran, 509 F.3d at 48 (citing Connick v. Myers, 461 U.S. 138, 150 (1983)). "[I]nsofar as self-interest is found to have motivated public-employee speech, the employee's expression is entitled to less weight in the Pickering balance than speech on matters of public concern intended to serve the public interest." O'Connor v. Steeves, 994 F.2d 905, 915 (1st Cir. 1993). In assessing the governmental interest in preventing disruption, this Court must also consider (1) "the time, place, and manner of the employee's speech," and (2) "the employer's motivation in making the adverse employment decision" when assessing the government's interest. Decotiis, 635 F.3d at 35 (quoting Davignon v. Hodgson, 524 F.3d 91, 104 (1st Cir. 2008)).

Despite MacRae's arguments to the contrary, D. 35 at 17–18, Defendants' asserted interest in preventing disruption is a legitimate government interest. Curran, 509 F.3d at 49 (explaining that employer need not show "actual adverse effect in order to terminate an employee under the Garcetti/Pickering test" and that "[s]ignificant weight is given to the public employer's 'reasonable predictions of disruption, even when the speech involved is on a matter of public concern'" (citation omitted)); see Bennett v. Metro. Gov't of Nashville & Davidson Cnty., 977 F.3d 530, 541 (6th Cir. 2020) (concluding that termination based on employee's social media post commenting on outcome of presidential election was justified given use of racial slur in post, detrimental impact on working relationships and detraction from public agency's mission to provide unbiased service). Indeed, given the District's stated mission to "[e]nsure a safe learning environment based on respectful relationships" and to maintain "[r]espect for human differences," D. 29-19, it would have a strong interest in preventing employee speech that reflects intolerance of groups of people represented in its student body or staff. See Bonnell v. Lorenzo, 241 F.3d 800, 824 (6th Cir. 2001) (recognizing that "learning institution has a strong interest in preventing" speech "that rises to a

level of harassment—whether based on sex, race, ethnicity, or other invidious premise—and which creates a hostile learning environment"); Estock v. City of Westfield, 806 F. Supp. 2d 294, 308 (D. Mass. 2011) (recognizing that public school has "strong interest in preserving a collegial atmosphere, harmonious relations among teachers, and respect for the curriculum"); Nichols v. Univ. of S. Miss., 669 F. Supp. 2d 684, 699 (S.D. Miss. 2009) (ruling that termination of professor was justified where professor's comments regarding sexual orientation and morality violated university's "sexual orientation harassment/discrimination policy," harmed professor's relationship with gay student and may have harmed professor's relationship with other students and faculty).

MacRae submits that this Court cannot conduct the balancing test until various factual disputes are resolved by a jury. D. 35 at 5. The Court addresses each of these alleged disputes.

### 2. MacRae's Alleged Factual Disputes

#### a) Whether Defendants factored the TikTok Video into their decision to terminate MacRae

MacRae submits that a factual dispute exists as to whether Defendants considered her TikTok video, which described her platform as a candidate in the May 2021 Bourne School Committee election, in their decision to terminate. D. 35 at 5. As to the materiality of this dispute, MacRae argues that because the TikTok video relates to her campaign for the Bourne School Committee, it is "of the highest order of speech and deserving of the highest protection." D. 35 at 6 (citing Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989)). Where MacRae's First Amendment interests are in her speech are stronger, Defendants' burden to justify her termination becomes more onerous. See Curran, 509 F.3d at 48.

The alleged dispute here, however, is not one of material fact for several reasons. First, the termination letter references the reason for MacRae's termination as the six memes. D. 29-17

at 2 (explaining that "continuing your employment in light of your social media posts would have a significant negative impact on student learning at HHS").  The only reference in that letter to the TikTok video is in reference to MacRae's own comments during the September 24, 2021 meeting. D. 29-17 at 1 (recounting that MacRae "stated that your FaceBook posts were 'liked' or 'tagged,' and were not created directly by you, but that the Tik Tok video clearly was").  Second, even assuming *arguendo*, that the termination decision was based on the memes and the video, D. 29-2 at 36 (testifying that [t]he decision to terminate Ms. MacRae was based on the memes and the TikTok video"), that fact is not material since the District would have justifiably terminated MacRae based on the memes alone, regardless of any alleged retaliatory motive as to the TikTok video.  See Salmon v. Lang, 57 F.4th 296, 312 (1st Cir. 2022) (explaining that but-for causation standard applies to First Amendment retaliation claims); Curran, 509 F.3d at 48–50 (concluding that government's justification was adequate based on violent and offensive portions of plaintiff's internet post even though other portions of post "expressed topics of value in the civil discourse"). Third, the Court's legal analysis would remain the same, that is, the Pickering balancing test would still apply and to extent the TikTok video would be accorded greater First Amendment value because of its connection to MacRae's campaign, the value of the six memes would not be similarly elevated.  See Curran, 509 F.3d at 48 (distinguishing between portions of internet post that had public interest value and portions that lacked value); Wright v. Ill. Dep't of Child. & Fam. Servs., 40 F.3d 1492, 1499 (7th Cir. 1994) (concluding that proper approach was to separately analyze three incidents of speech for which plaintiff was allegedly punished).

Accordingly, this matter of the TikTok video does not present a disputed issue of material fact.

b)     Whether MacRae posted the Track Meet Meme

Although MacRae now disputes that she "posted" the Track Meet Meme, D. 35 at 6–7, the resolution of this dispute is not material.  That another TikTok user posted the Track Meet Meme and tagged MacRae, MacRae Aff. ¶¶ 10–11, does not contradict MacRae's undisputed deposition testimony that she liked, shared, or reshared each of the six memes, D. 29-3 at 17, such that it was her (at least adopted) speech.  Nor did Defendants terminate MacRae based on a mistaken or incorrect assumption that MacRae herself was the original author of any of the six memes.  D. 29-1 at 12; D. 29-2 at 19.  Accordingly, there is no dispute of material fact as to this issue.

c)     Whether Ferron, Mattos and Plummer misinterpreted MacRae's intent in posting the memes and TikTok video

MacRae argues that her memes and TikTok video were not "intended to mock, make fun of, or be offensive to certain people" but to "express certain positions about matters of public concern." D. 35 at 9.  This is not a dispute of material fact, however, especially where the District does not contest, for the purposes of this motion, that MacRae spoke as a private citizen, D. 28 at 13; see Hayes v. Mass. Bay Transp. Auth., 498 F. Supp. 3d 224, 228 (D. Mass. 2020) (explaining that "nothing turns on whether [employee] harbored subjective racist intent" when evaluating First Amendment retaliation claim since the issue is whether the "termination violated his right of free speech"), but that the Pickering balancing test weighs strongly in its favor.  Moreover, the Court need not submit to the jury whether MacRae's speech was motivated by self-interest, animus towards certain groups or a desire to participate in public discourse on a matter of legitimate concern, given that the form and context of MacRae's speech in the memes is undisputed, see Fabiano v. Hopkins, 352 F.3d 447, 454–55 (1st Cir. 2003)(concluding that "form and context of [plaintiff's] expression indicates a subjective intent to contribute to public discourse" and thus speech "addressed a matter of public concern"); O'Connor, 994 F.2d at 915 (weighing plaintiff's

"motives for speaking out" in <u>Pickering</u> balance), and the issue in dispute is the balancing of that speech against the District's interest in avoiding disruption.

> d) <u>Whether MacRae acknowledged the potential impact of her social media posts during her September 24 interview</u>

MacRae contends that there is a factual dispute as to the substance of her answers during her September 24, 2022 interview with Mattos, D. 35 at 13, as it relates to actual or anticipated disruption caused by her memes. First, MacRae asserts that during her September 24 interview, Mattos sometimes asked MacRae questions regarding her "situation in Bourne" rather than explicitly asking about MacRae's social media activity. D. 35 at 13. All the evidence in the record indicates that "the local media coverage of [MacRae's] situation in Bourne as a School Committee member" was her social media posts and the local community's reaction thereto. D. 29-6; D. 29-8; D. 29-13 at 1; D. 29-16 at 1. MacRae offers no explanation as to what her "situation in Bourne" could have referred to other than local media coverage regarding her social media activity. D. 35 at 14.

Second, MacRae asserts that she did not answer "Absolutely" in response to Mattos's question about whether she agreed that media coverage of her situation in Bourne "may be widespread among students, staff and families of HHS." D. 35 at 14; see D. 29-3 at 42 (testifying "I don't think I would have said absolutely, because I don't think it was widespread"). At her deposition, MacRae could not recall what her response was, but disputed the characterization of media coverage as "widespread" in Hanover. D. 29-3 at 42. Even so, MacRae conceded that "there was probably some students and staff that were aware of it." D. 29-3 at 42. In any event, other, uncontroverted evidence shows that at least some Hanover teachers and students were aware of the media coverage early in the week of September 20. D. 29-12 at 9; D. 29-15 at 5.

14

Third, MacRae disputes the characterization of her response to the question, "Can you see how your situation in Bourne may impact the learning environment of some students within your classes?" D. 35 at 14. MacRae does not appear to dispute the accuracy of Mattos's transcription of her response, "Yes I see what you are saying." D. 29-13 at 2; D. 29-16 at 1; D. 29-3 at 42 (testifying that "I do recall saying that I can see what he was saying"). According to MacRae, she did not "acknowledge[] her posts may impact the learning environment and students in her class" by making this statement. Id. (citing D. 28 at 16). Instead she only stated "she could understand why Mattos thought that the situation in Bourne may impact the learning environment in Hanover." D. 35 at 14. Even accepting MacRae's characterization of her response, there is not a genuine dispute of material fact that MacRae acknowledged that the District's concern that a potential impact on the learning environment was at least "understand[able]," and that it was possible that District students and staff had seen the media coverage of her posts. D. 35 at 14. Moreover, Defendants do not solely rely upon MacRae's interview statements to establish disruption, but rather upon the entirety of the record which includes undisputed evidence that the risk for disruption existed as discussed further below. D. 29-1 at 8; D. 29-2 at 3, 9–10, 20, 34; D. 29-4 at 10; D. 29-7; D. 29-8; D. 29-12 at 8–9. MacRae has not established a material dispute of fact as to this issue.

e)   Whether administrators were aware of any teachers' concerns
     about MacRae's social media posts

MacRae also argues that a factual dispute exists as to whether Plummer, Mattos or Ferron were aware of any teacher concerns related to the impact of her posts on students or the learning environment. D. 35 at 12.

At least three teachers, Pereira, McLean and Galotti testified as to their concerns regarding the response of the school community and any disruption to student learning. D. 29-15 at 5–6

(testifying by Pereira that she wanted the District's administrators to "get ahead of" any "community response" or "disruption to student learning"); D. 29-12 at 7 (testifying by McLean that he was concerned that MacRae's posts would be "contentious within our community"); D. 29-14 at 5–7 (testifying by Galotti that she was "very surprised and saddened" by MacRae's posts and didn't "think [the posts] create[ed] a safe learning environment"). Mattos and Ferron reached the same conclusions as the teachers based on their own experience. See, e.g., D. 29-1 at 3, 8 (describing Ferron's experience as school administrator and testifying "I feel strong that the students would not feel safe or support[ed] in that person's classroom"); D. 29-2 at 16–17 (describing courses Mattos took which informed his understanding of what would be offensive to students and testifying that "I think [one of the memes is] just disparaging towards individual who may perceive themselves to be transgender or identify themselves as transgender"). Even if the Court accepts MacRae's contention about when teachers' concerns were relayed to Mattos and Ferron, such a fact is not material to resolution of her claim. As previously noted, other evidence in the record supports Mattos and Ferron's conclusion that the memes posed a substantial risk of disruption.

f)      Whether Ferron, Mattos and Plummer terminated MacRae
because they disliked her social media posts

MacRae asserts a genuine factual dispute exists as to whether her termination was motivated by dislike or disagreement with her social media posts, rather than concern for the negative impact of those posts on student learning. D. 35 at 7–8. MacRae first points to Plummer's testimony that he was "horrified" upon learning of the social media posts and describing the six memes as a "ball of hate" consisting of transphobia, homophobia and racism. D. 35 at 7 (D. 29-4 at 10). The Court notes that a "fervent objection" toward the perceived bigoted nature of MacRae's speech alone would not establish retaliatory animus. See Locurto v. Giuliani, 447 F.3d 159, 180

16

(2d Cir. 2006) (ruling that mayor's comment that "plaintiffs' speech [w]as 'a disgusting display of racism' does not, without more, mean he fired the plaintiffs in 'retaliation' for engaging in racist speech").  Indeed Plummer explicitly connected his testimony regarding the perceived transphobia and racism to the impact on student learning.  D. 29-4 at 10 (testifying that MacRae "should not be in a public high school classroom" because students embodying characteristics targeted by her posts would be in her classroom and "student[s] need[ ] to feel safe and comfortable").

MacRae further objects that Defendants did not seek out student or teacher input or become aware of student or teacher concerns prior to terminating MacRae.  D. 35 at 8.  The record shows that Ferron, Mattos, and Plummer testified as to their belief that MacRae's social media posts could detract from the District's goal of providing students a safe learning environment.   D. 29-1 at 8, 13; D. 29-2 at 10, 22; D. 29-4 at 10.  This testimony is consistent with the reasons listed in MacRae's termination letter and with the values listed in the District's Mission Statement.  D. 29-17; D. 29-19.  The fact that Mattos and Ferron were not actively soliciting student and teacher input does not suggest that their stated justification that MacRae's social media posts and the surrounding controversy would negatively impact Hanover students was mere pretext.

MacRae's citation to Hayes is unavailing.  Hayes, 498 F. Supp. 3d at 233–34 (concluding that supervisor's failure to call other employees who witnessed plaintiff's speech before termination was evidence indicating that potential workplace disruption was pretextual).  Unlike Hayes, which involved a "verbal reaction" in the workplace which was witnessed only by employees who were present, MacRae's speech was publicly available and documented by the local media.  That speech had also caused disruption regarding the school system of another town and drawn media attention.  D. 29-6; D. 29-7; D. 29-8; D. 29-10.  Given that Defendants were concerned about disruption to student learning and interested in maintaining the confidentiality of

a personnel matter, their limited solicitation of student and teacher input does not warrant a different outcome.  D. 29-1 at 25; D. 29-4 at 9, 16; D. 29-10.  Nor does the involvement of senior school administrators, such as the superintendent and principal, in light of the potential media coverage on the District and the administrators' normal job responsibilities.  D. 29-1 at 3–4, 7 (testifying that Ferron's responsibilities as superintendent include personnel management); D. 29-2 at 21 (testifying as to Mattos's experience conducting investigations concerning social media posts that might impact students); cf. Hayes, 498 F. Supp. 3d at 234 (finding that jury could infer pretext where "record does not disclose whether these senior officials would typically be involved in disciplinary action for disruptive behavior").

Finally, MacRae objects that Mattos and Ferron "ignored answers MacRae provided during her interview with Mattos," including that she used a student's preferred pronouns in the classroom.  D. 35 at 8.  MacRae reportedly also stated in her interview that she did not allow her "personal views" in the classroom and that she "embrace[d] every single child['s] choice."  D. 29-13 at 5; D. 29-16 at 2.  At his deposition, Ferron explained that MacRae's anecdote regarding her use of preferred pronouns did not outweigh MacRae's acknowledgment of a potential impact on student learning caused by her posts.  D. 29-1 at 22.

Thus, on the record in the instant case, no reasonable factfinder could infer that that Defendants were not focused on the actual or potential effects of MacRae's behavior on the school environment.  See Curran, 509 F.3d at 47 n.6 (rejecting argument that underlying motivation for termination was plaintiff's support of opposition candidate for sheriff as not preserved and not supported by the factual record).

18

g)      Whether MacRae's social media posts would reasonably cause
disruption to learning

Finally, MacRae disputes whether any actual disruption took place or whether there was any potential for disruption.  D. 35 at 14–16.  Whether MacRae's posts caused actual disruption in the Hanover community is material but not dispositive to the Pickering analysis.  See Nichols, 669 F. Supp. 2d at 698-99 (granting summary judgment in favor of university where professor's statements in classroom caused one student to feel "awkward" and seek reassignment and had potential to harm relationship with other students as well).  It is undisputed that at least some teachers were concerned about the learning environment, D. 29-15 at 5–6; D. 29-12 at 7; but less clear that teachers needed to devote substantial class time to addressing distractions caused by the posts.  See D. 29-12 at 9 (testifying that McLean "immediately" moved on from classroom conversations about MacRae and could not speak to students' "mental headspace," but "it was certainly occupying enough of their time for them to be mentioning it"); D. 29-15 at 9 (testifying that Pereira "would nip [student discussion of MacRae] in the bud"); see Durstein v. Alexander, 629 F. Supp. 3d 408, 424 (S.D.W. Va. 2022) (concluding that actual disruption occurred where teacher testified that "students wanted to spend time discussing the tweets" and "explained that they did not feel comfortable being taught by Plaintiff").    Nor were there reports of calls or complaints from parents or other community members.  Cf. Durstein, 629 F. Supp. 3d at 424–25 (concluding that Pickering balance tipped in employer's favor where administrators received calls and complaints from parents, press, current and former students, and fellow teachers).

Defendants, however, "need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'"  Curran, 509 F.3d at 49 (quoting Connick, 461 U.S. at 152).  Defendants have adduced ample evidence to show that MacRae's speech had the potential to disrupt the District's learning environment.

Although MacRae objects that "Ferron, Mattos, and Plummer only relied on their own beliefs in concluding that MacRae's social media posts would be a disruption in the classroom," D. 35 at 15, those beliefs were supported by school administrators' training and experience.  D. 29-1 at 3, 8; D. 29-2 at 16–17.  Moreover, MacRae acknowledged in her September 24, 2022 interview that "she could understand why Mattos thought that the situation in Bourne may impact the learning environment in Hanover."  D. 35 at 14.  As a teacher, MacRae's role required her to interact with members of the public, including students and parents on a regular basis.  See Durstein, 629 F. Supp. 3d at 426 (explaining that "the more the employee's job requires . . . public contact, the greater the state's interest in firing her for expression that offends her employer" and concluding that teacher had "direct contact with members of the public every day"); cf. Johnson v. Ganim, 342 F.3d 105, 115 (2d Cir. 2003) (concluding that factual question existed as to whether the conduct of an employee, a custodian, could lead to potential disruption where he was "not involved in policy-making decisions" and had limited interaction with other employees or the public).  Students in MacRae's classroom and within the District embodied characteristics that MacRae's posts appeared to denigrate.  D. 29-2 at 20; D. 29-3 at 19; D. 29-4 at 10; D. 29-12 at 14; D. 36 ¶¶ 34, 48 (disputing reasonableness of Defendants' concern for student safety and learning, but not characteristics of students in MacRae's classroom); see Durstein, 629 F. Supp. 3d at 424–25 (concluding that that "[i]t was reasonable for the Board, reading the tweets that seemingly disparaged Muslim, Jewish, and Black students, and knowing that the student body contained students of this very race and these very religions, to infer that the disparaging comments would cause a serious internal disruption in the school").  Moreover, at least some of MacRae's speech was at odds with the District's stated mission of providing a "safe learning environment based on respectful relationships" and promoting "[r]espect for human differences."  D. 29-19; see, e.g., D.

29-9; Nichols, 669 F. Supp. 2d at 699 (concluding that professor's termination did not violate First Amendment where his statements violated university's policy to "foster an environment of respect for the dignity and worth of all members of the university community").

In response, MacRae points to her testimony that she never shared her personal views in the classroom, that she developed a positive relationship with a Cape Verdean, LGBTQ student in Wareham after her termination in Hanover and that transgender students in Wareham did not drop out of her classes.  D. 35 at 15–16; see D. 29-3 at 38–39, 42.  Moreover, MacRae's comments were made outside the school, prior to her employment by the District.  Meagher v. Andover Sch. Comm., 94 F. Supp. 3d 21, 41 (D. Mass. 2015) (concluding that speech outside of work using private computers and emails was less likely to disrupt workplace).

An employer's "reasonable predictions of disruption even when the speech involved is on a matter of public concern" are entitled to "significant weight." Curran, 509 F.3d at 49 (internal citation and quotation marks omitted).  Given the media coverage and controversy surrounding MacRae's posts in Bourne, Mattos and Ferron had a basis for being concerned about a risk to the District's operations given MacRae's memes and the publicity surrounding them.  Even if it was before her employment in the District and outside of the classroom, her speech was no longer private and had the potential to bring disruption to her role as a public-facing employee of the District.  See Durstein, 629 F. Supp. 3d at 425 (explaining that social media both amplifies speaker's message and increases potential for disruption to employer's interest even where teacher did not seek press coverage of social media posts or identify connection to school district).  As to MacRae's experiences in Wareham, no evidence in the record suggests that Defendants were aware of such information when they were deciding whether to terminate MacRae.  Even if Mattos and Ferron had been aware of that information, their own determination that a substantial risk of

potential disruption existed is supported by the record of undisputed material facts here, which includes teacher concerns, observations that students were aware of MacRae's posts, a contemporaneous controversy in Bourne regarding the very same speech.  D. 29-6; D. 29-7; D. 29-12 at 7; D. 29-14 at 5–7; D. 29-15 at 5–6; see Shepherd v. McGee, 986 F. Supp. 2d 1211, 1220 (D. Or. 2013) (concluding that subsequent disagreement regarding whether plaintiff's social media posts adversely affected her credibility does not show that investigation was unreasonable or render her termination unconstitutional).

Finally, MacRae further argues that Defendants cannot rely on the reaction of the Bourne community to establish potential disruption, because Ferron testified that he did not "learn[] anything new" from watching the Bourne School Committee meeting. D. 29-1 at 11; D. 35 at 15; D. 36 at 10–11.  The fact that the Bourne School Committee meeting did not present "anything new" does not mean that it did not reinforce what Ferron's extant concerns regarding the impact of MacRae's speech on student learning.  Even accepting MacRae's characterization of Ferron and Mattos's deposition testimony, the events in Bourne still reflect on the reasonableness of Defendants' predictions of the likely impact in Hanover.  Snipes v. Volusia Cnty., 704 F. App'x 848, 853 (11th Cir. 2017) (concluding that county manager's "expectations . . . developed over nearly four decades in public service" justified termination where subsequent litigation revealed that local community would have protested failure to take decisive disciplinary action).

Although MacRae raises some factual disputes, none are as to material facts as discussed above.  The Court thus turns to the application of the Pickering balance in this case.

### 3. *Application of the Pickering Balancing Test*

In support of her opposition to the motion for summary judgment, MacRae attaches newspaper opinion pieces and the biography of "one of the nation's most prominent economists," which she asserts show that she is "not alone in her views."  D. 35 at 10; D. 36-2 at 74–93.  Here,

the memes at issue included but were not limited to an image of Assistant Secretary of Health Rachel Levine with the caption: "'I'm an expert on Mental Health and Food Disorders.'… says the Obese Man who thinks he's a woman," D. 29-9; D. 37 ¶ 5; text, interspersed with icons of faces expressing various emotions: "I feel bad for parents nowadays.  You have to be able to explain the birds & the bees… The bees & the bees…  The birds & the birds… The birds that used to be bees… The bees that used to be birds… The birds that look like bees… Plus bees that look like birds but still got a stinger!!!," D. 29-9; D. 37 ¶ 5; and the Track Meet Meme.  "Speech done in a vulgar, insulting and defiant manner is entitled to less weight in the <u>Pickering</u> balance," <u>Curran</u>, 509 F.3d at 49; <u>Bennett</u>, 977 F.3d at 538 (concluding that Facebook post regarding outcome of national election did not deserve "highest rung" of First Amendment protection where post also contained racial epithet).  Viewing the record in the light most favorable to the non-movant MacRae, however, arguably are at least some portions of the posts which relate to public debate on immigration policy or racism or gender identity (even if they were disparaging or dismissive of same, <u>see, e.g.</u>, image of a young Latino in a hoodie with the caption: "Retirement Plan: 1) Move to Mexico 2) Give up citizenship 3) Come back illegally 4) Set for life!," D. 29-9) which may be accorded higher value by the First Amendment.  <u>See</u> <u>Riley's Am. Heritage Farms v. Elsasser</u>, 32 F.4th 707, 717 (9th Cir. 2022) (concluding that "minor occurrences" of disruption was outweighed by plaintiff's "interest in engaging in controversial, unique political discourse" on his personal social media account).

Even so, the Court finds that Defendants have adduced ample evidence of the potential for disruption to student learning and to the District's mission which adequately justified MacRae's termination.  As a public school teacher, contact with the public, including students and parents who may have been part of groups that MacRae's posts disparaged, was part of MacRae's day-to-

day responsibilities.  See Durstein, 629 F. Supp. 3d at 427.  MacRae herself acknowledged that her posts could be viewed as derogatory towards transgender individuals.  D. 36 ¶ 35; D. 29-3 at 23, 38.  Several colleagues recognized the posts as inconsistent with the District's mission to promote tolerance and respect for human differences.  D. 29-1 at 8; D. 29-2 at 7; D. 29-4 at 10; D. 29-12 at 5–7.  Moreover, Defendants' concerns regarding the nature of MacRae's posts were directly tied to a risk of disruption in student learning.  Mattos, Ferron and other teachers testified that MacRae's posts, and especially posts regarding transgender students, could make students feel unsafe, unwelcome or otherwise distracted from learning.  D. 29-1 at 8, 13; D.  29-2 at 7, 10, 16, 21; D. 29-4 at 5, 10–12; D. 29-12 at 5–6; D. 29-14 at 4–7; D. 29-15 at 6.  Defendants were entitled to terminate a public-facing employee who had taken a stance in direct contradiction to the District's stated mission.  See Nichols, 669 F. Supp. 2d at 699; Bennett, 977 F.3d at 540.

A greater risk of disruption arose from the growing media attention on MacRae's posts which could have triggered a larger external response in Hanover.  The media coverage identified MacRae by name and as a Bourne School Committee member.  D. 29-8; D. 29-1 at 7.  Members of the Hanover High School community were able to identify MacRae, then a new teacher to the school, as the subject of that media coverage.  D. 29-1 at 3, 6; D. 29-2 at 4, 32; D. 29-10; D. 29-12 at 9; D. 29-14 at 5–6.  Compare Durstein, 629 F. Supp. 3d at 425 (recognizing disruption where administrators were forced to investigate teacher's social media posts and respond to press inquiries), with Moser v. Las Vegas Metro. Police Dep't, 984 F.3d 900, 910 (9th Cir. 2021) (concluding that record did not support disruption where there was no media coverage, no evidence that anyone other than an anonymous tipster saw police officer's Facebook comment and most people would not have been able to connect police officer's Facebook profile with employment).  Even if some parties would have supported MacRae's position or shared her views, the potential

for disruption remained.  See Estock, 806 F. Supp. 2d at 308 (granting summary judgment to employer where teacher's speech advocating against phase-out of school's HVAC program created hostile parent reaction against supervisors and school system).

The limited evidence of actual disruption does not preclude summary judgment in this case. MacRae was a new teacher who had only taught at most a couple weeks at Hanover High School when news coverage of her social media posts began circulating.  D. 29-14 at 4; D. 36 ¶ 8, 12. Mattos and Ferron immediately removed MacRae from her teaching duties and advised staff to keep the matter confidential.  D. 29-10 at 1; D. 36 ¶ 19.  School administrators should not be discouraged from taking action to minimize disruption to student learning.  See Snipes, 704 F. App'x at 853 (upholding swift termination by county for racially insensitive on Facebook remarks where negative consequences were "reasonably possible" had officer remained employed); Kent v. Martin, 252 F.3d 1141, 1145 (10th Cir. 2001) (explaining that where employer immediately fires employee "predictions of disruption were the only possible evidence of the employer's interest in regulating the expression at the time of the firing" and recognizing that consideration of the "reasonable prediction of disruption [has been] done . . . in the context of a termination soon after the employee's exercise of speech, when the intent of the termination was to avoid actual disruption").  Moreover, Mattos and Ferron were not merely speculating about the potential disruption.  MacRae's same speech had caused considerable controversy in Bourne, resulting in a school Board meeting where teachers, students and parents expressed concerns relating to student safety and the learning environment.  D. 29-6.

MacRae's argument that distinctions between the present case and Hennessy require the Court to deny summary judgment is unpersuasive.  Hennessy v. City of Melrose, 194 F.3d 237 (1st Cir. 1999).  Hennessy recognizes the deference this Court must give to a school district's

"interest[s] as an employer in guarding against the impairment of relations among teachers" and "in implementing the curriculum without undue interference." Id. at 247–48.  Although this case may not involve the same level of "audible denigration and visible petulance" in the workplace present in Hennessy, id. at 248, the First Circuit has not suggested that Hennessy was a close case or that verbal workplace insubordination was the only constitutional basis on which an employer could terminate an employee for their speech.  See id. at 249 (describing deference owed to government as employer to effect efficient operation and concluding that present case "comes within its heartland").

Finally, even if the Court were to consider the TikTok video a basis for MacRae's termination and accord the same greater First Amendment value, her comments regarding transgender students in the video remained in direct conflict with the District's stated mission, garnered media attention and implicated similar concerns regarding the District's ability to create a safe learning environment for all.  D. 29-2 at 10, 14; D. 29-8 at 3; see Jantzen v. Hawkins, 188 F.3d 1247, 1258 (10th Cir. 1999) (upholding termination immediately after police officer announced that he was running for sheriff).

For all of these reasons, Defendants are entitled to summary judgment on MacRae's claim.

### C.    Qualified Immunity

The individual Defendants also claim summary judgment on the basis of qualified immunity.  Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Pearson v. Callahan, 555 U.S. 223, 231 (2009). In determining whether a government official is entitled to qualified immunity, the Court must determine: (1) "whether the plaintiff's version of the facts makes out a violation of a protected

right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Alston, 997 F.3d at 50. "The question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017). "[F]or the right to be clearly established, the plaintiff must point to controlling authority or a body of persuasive authority, existing at the time of the incident, that can be said to have provided the defendant with fair warning."   Decotiis, 635 F.3d at 37 (internal citation and quotation marks omitted).

Even assuming *arguendo* that it had been shown that Defendants had violated MacRae's constitutional right, the Court focuses on whether the right MacRae asserts was clearly established at the time of her termination, i.e., the second, requisite prong of the analysis. Punsky v. City of Portland, 54 F4th 62, 66 (1st Cir. 2022). This second prong has two aspects: "whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right," and "whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right." Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016). Neither element is satisfied here as to Ferron or Mattos. See Diaz-Bigio v. Santini, 652 F.3d 45, 54 (1st Cir. 2011) (recognizing that liability under the "fact-intensive balancing test" required by Pickering "can rarely be considered 'clearly established' for qualified immunity") (internal citation and quotation marks omitted). The legal contours were not sufficiently clear as to the right that MacRae asserts here and reasonable officials could have concluded that MacRae's speech and the associated media coverage posed a risk of disruption to the District's learning environment, which the District would have a strong interest in avoiding. See Bonnell, 241 F.3d at 824. When MacRae's termination

occurred in 2021, several federal cases supported the position that a public employee could be terminated for statements on a personal social media account expressing sentiments that call into question the employee's ability to provide public services fairly and equitably, even where the speech is in some way connected to a political opinion.  See, e.g., Bennett, 977 F.3d at 545 (concluding that government's "interest in maintaining an effective workplace with employee harmony that serves the public efficiently outweighs [emergency call operator's] interest in incidentally using racially offensive language" in a social media comment related to the 2016 election); Shepherd, 986 F. Supp. 2d at 1214 (ruling that termination of child protective services worker's social media comments disparaging individuals who obtained public assistance was justified where worker's ability to fulfill job duties credibly had been impaired); see also Connick, 461 U.S. at 147-48 (explaining that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement").  The right that MacRae asserts was not clearly established at the time of Defendants' alleged misconduct, see Punsky, 54 F4th at 67 (concluding that "any reasonable [official] would have objectively believed that his or her actions did not violate appellant's constitutional rights") and, accordingly, Defendants Mattos and Ferron are entitled to qualified immunity.

## VI.   Conclusion

For the foregoing reasons, the Court DENIES the motion to strike, D. 40, except as to the date of the Bourne School Committee election, which is ALLOWED.  The Court ALLOWS Defendants' motion for summary judgment, D. 27.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge